## HUNTER v. WESTERN UNION TELEGRAPH COMPANY.

(Filed June 10, 1902.)

1. NEGLIGENCE — *Telegraphs—Evidence—Sufficiency—Mental Anguish—Verdict—Directing.*

   In an action for damages for mental anguish for delay in delivering a telegram, the trial judge should not direct a verdict against the defendant if there is more than a scintilla of evidence tending to prove that the defendant exercised due care and diligence.

2. EVIDENCE—*Conflicting—Sufficiency—Questions for Jury—Verdict—Directing.*

   Where there is a conflict of testimony, or it is susceptible of different interpretations, the issue must be left to the jury without any intimation of opinion on the part of the trial judge.

ACTION by T. A. Hunter against the Western Union Telegraph Company, heard by Judge *Thos. J. Shaw* and a jury, at September Term, 1901, of the Superior Court of GUILFORD County.

### TESTIMONY FOR DEFENDANT.

Mr. Horry, witness for the defendant, testified as follows: "I am agent for the defendant here in Greensboro, and have been for eleven years. I have been operator for fifteen years. Wharton delivered the message to me. This is the message filed 3:03 p. m., on Sunday. Had Sunday hours here at that time. Did not know whether they had Sunday hours at Kinston. I stated to Wharton that it was Sunday, and doubtful whether I could get it through till next morning. I sent it to our first relay office, Richmond, Virginia, at 4:15, regular course. On Sunday at that time we did not open all day, and I happened to be at the office at 3:03, and I got Richmond as promptly as I could, and sent it off."

*Cross-Examination:*

"I have a distinct recollection of what occurred when Wharton brought the message. I always state this on Sunday, and this is why I say I told Wharton this that day. Richmond had no Sunday hours. I do not swear that the wire was out of fix that day. Our rule is to charge for forwarding messages if the party is gone. We do forward them if requested to do so."

(Witness was here shown the memorandum on the back of the original telegram in question, and asked in whose handwriting it was. The witness replied that it was in his. Witness was then asked if he did not make this memorandum for the purpose of showing that there was no negligence on his part by reason of his inability to get Richmond within a reasonable time, but that it was the fault of the Richmond office. Witness said that it was for this purpose, and to protect himself against any charges from the company in the future. The memorandum showed that the operator in Greensboro had been calling the Richmond office for about one hour and ten minutes.)

*Re-direct:*

"I have a distinct recollection of telling Wharton it was Sunday and doubtful about getting it through."

R. C. Thompson, witness for the defendant, testified as follows:

"I live at Richmond, Virginia, and was telegraph operator at the Western Union office at that time. I was on duty this Sunday at 3 o'clock and thereafter. Went on duty at 8 o'clock and off at 10:30. I received this message in question at 4:20 p. m. Heard no call in my office from Greensboro office before that time. Am always on the outlook for calls. May have been some atmospheric trouble. Sunday hours at Kinston were from 7 to 8 o'clock in the afternoon, and morn-

ing hours, from 8 to 9 o'clock. This is a fair, reasonable rule. I remember the message distinctly. Mr. Horry told me he had called me for some time. I took the message, and went to the Kinston circuit, and called the agent at Kinston, and from that time on, I can not say how often, but I did call at intervals up to 8 o'clock that night, and no one responded at Kinston. I sent the message next morning at 8:06 o'clock. Kinston was supposed to be open after 8 o'clock in the morning."

*Cross-Examination:*

"I had been operator twenty-five years. There is not as much business on the Sabbath on Greensboro line as on other days. I can not say how many times I noticed the Greensboro lines between 3:03 and 4:20. I had noticed no trouble on the wire that day. I do not swear that there was no trouble on the wire that afternoon. If I had been at the instrument I could have received the message in two minutes after it was sent from Greensboro, and if Kinston had been at his office he could have received it in the same time. I can not say whether Kinston hours were from 6 to 7 or from 7 to 8 p. m. By reason of his being out during the day of Sunday he was expected to be at his office closely during office hours on said day. I called Kinston, I suppose, every five or ten minutes during office hours. I can not say there was any trouble on the Kinston wire. There was no report of any trouble. I think Kinston had between three and five instruments."

*Re-direct:*

"If Kinston had been observing Sunday hours I could not have gotten him before his Sunday hours arrived."

J. E. Stephens, witness for the defendant, testified as follows:

"I live at Goldsboro at present. Lived at Kinston in January, 1899. I am a telegraph operator, and had been on duty at Kinston prior to this time one year, and have had seven years' experience as operator. Sunday office hours at Kinston were from 9 to 10 a. m., and from 7 to 8 p. m., and during the week from 8 a. m. to 9 p. m. Rules had been in effect for some time, and they were reasonable hours. No complaint whatever. I was in the office from 6:50 p. m. to 8 p. m. on that Sunday, and did not receive the message. I heard no call from Richmond. I was writing letters on the Richmond table part of the time that night. I know nothing to have prevented it unless there was some interruption on the wire. It was received at 8:07 o'clock Monday morning. Mr. Thompson called my attention to the delay, and I took the message to Tull Hotel, and was informed that Mr. Hunter had gone to Parmelee. I went back to office and called up Greenville, and forwarded the message to Mr. Hunter to be delivered on the train."

*Cross-Examination:*

"When I left that morning I cut out the Richmond instrument, and when I came back I pulled out the plug, and it went to work, and I was in the office all the time. I was at work on another wire. I was working on the Greenville and Tarboro wire about ten minutes of the time. I think I received more than one message. I can't swear I received more than one. I was sitting by the table one-half of the time. I think I received two messages, commercial messages, during office hours that afternoon. They were ordinary messages. I can take twenty words in a minute. This was all the time I was interrupted that I remember. The instruments were in perfect condition, and the wire was, as far as I know. If the call from Richmond had come through I would have heard it. I did not hear any call. I wrote two letters during the time. One was a business letter, and the other a social letter. I had

nothing else to do. Next morning Richmond told me he had been calling me the night before, and that it was a death message, and for me to rush it. Although it was against the rules to forward a message without being paid for it, I sent the message off the next morning in violation of the company's rules."

D. J. Wichard, witness for defendant, testified that he lived at Greenville, N. C., in January, 1899, and was manager of defendant company there; that he received a message at 8:30, and sent it immediately to depot; and that the messenger was cautioned to be sure and catch Mr. Hunter.

It was admitted that the summons was dated February 8, 1899; was served February 16, 1899, and that the complaint was filed May 22, 1899.

The defendant presented the following prayers for special instructions in writing:

(1) It being admitted that the "Scott" referred to in the pleadings and in the message was a second cousin of the plaintiff, such relationship is too remote, and the failure to get the message in time to be present at the funeral and the consequent mental anguish therefrom is too remote, and no damages can be based thereon, and accordingly you will not consider that in making up your verdict. This was refused.

(2) Mental anguish is not an element of damages in this case, it being admitted that the relationship between the plaintiff and the "Scott" mentioned in the telegram were only second cousins. This was refused by the Court.

(3) A telegraph company may make reasonable rules and regulations for the conduct of its business, and if you find from the evidence in this case, that the rules in force at that time were reasonable, and that the failure to deliver the message was in consequence of these rules, then the defendant was not negligent in that regard. This was refused by the Court except as set out in the charge.

The Court charged the jury upon the first issue that if they believed the evidence to answer said issue, "Yes."

Upon the second issue, the Court charged the jury, among other things, in substance, that if they believed the evidence they would find that J. S. Hunter was the father of the "Scott" referred to in the telegram, and that the plaintiff and J. S. Hunter were first cousins, and that from such relationship there is no presumption that the plaintiff suffered mental anguish on account of his inability to be present at the funeral of the child Scott, but that the burden was upon plaintiff to show by the greater weight of evidence that there existed between the plaintiff and the said Scott such tender ties of love and affection that his inability to be present at the funeral caused him to suffer mental anguish, and that such inability to be present was caused by the negligence of the defendant company.

From judgment for the plaintiff, the defendant appealed.

*Scales & Scales,* for the plaintiff.
*King & Kimball* and *F. H. Busbee,* for the defendant.

DOUGLAS, J.   This is an action for damages for mental anguish alleged to have been suffered by the plaintiff in consequence of the failure of the defendant to promptly deliver a telegram announcing the death of a child five years of age, who was the plaintiff's second cousin, and at whose funeral the plaintiff would otherwise have been present.

The comparatively distant relationship between the plaintiff and the deceased gave rise to an interesting discussion as to its bearing upon the right of recovery, which is not necessary for us to consider in the present aspect of the case.   It makes no difference what the plaintiff may have suffered if such suffering was not caused by the negligence of the defendant.   In the very nature of things a telegraph company can

not insure the delivery of a message, and can be held liable for a non-delivery only upon its failure to exercise such reasonable care and diligence as the circumstances of the case may require. In view of the nature of telegraphic communication, a failure to transmit and deliver a message within such reasonable time as will effect its purpose is in its nature and results equivalent to non-delivery. It is true the failure to deliver a message shown or admitted to have been received by the company is *prima facie* evidence of negligence; but the presumption arising therefrom is not conclusive. It merely shifts to the defendant the subsequent burden of proof upon that issue. That is, the defendant must then show by the preponderance of the evidence that it has not been guilty of negligence, and of the weight of such evidence the jury alone are the lawful judges. This brings us to the dominating exception in the case, which was to the direction of his Honor that if the jury believed the evidence they should answer in the affirmative the issue as to the negligence of the defendant. In this we think there was error. It is needless to recapitulate the evidence; but it seems to us that, considering the evidence in the light most favorable to the defendant, and in such light we must consider it under such an instruction, the jury might have found the issue in the negative. In other words, there was more than a scintilla of evidence tending to prove that the defendant exercised due care and diligence in the premises. We do not mean to intimate that such was the preponderance of the evidence, as that is not for us to say.

His Honor properly left to the jury the credibility of the testimony, and if that had been all to one effect there would have been no error. *Nelson v. Insurance Co.,* 120 N. C., 302. But where there is a conflict of testimony, or it is susceptible of different interpretation, the issue must be left to the jury without any intimation of opinion on the part of the Court. *Eller v. Church,* 121 N. C., 269; *Moore v. St. Railway,* 128

N. C., 455. In *Hardison v. Railroad,* 120 N. C., 492, the Court says: "But as the defendant introduced evidence tending to show there was no negligence on the part of defendant in killing the cow—that is, to rebut the presumption or *prima facie* case of plaintiff—it then became an issue of fact, which could not be found by the Court, and should have been left to the jury."

The degree of care and diligence required of a telegraph company in the transmission and delivery of messages, which on their face are of vital interest, has been too fully discussed by this Court to require further comment. *Lyne v. Telegraph Co.,* 123 N. C., 129; *Cashion v. Tel. Co.,* 123 N. C., 267; *same case,* 124 N. C., 459, 45 L. R. A., 160; *Laudie v. Tel. Co.,* 124 N. C., 528; *Hendricks v. Tel. Co.,* 126 N. C., 304, 78 Am. St. Rep., 658; *Bennett v. Tel. Co.,* 128 N. C., 103. For error in the direction of his Honor, there must be a

New trial.